IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

FAMATTA M. BAUGH                    )
                                    )
v.                                  )    No. 3:05-0951
                                    )    Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION      )


To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB") and supplemental security income
("SSI"), as provided under Titles II and XVI of the Social
Security Act ("the Act"), as amended.  The case is currently
pending on plaintiff's motion for judgment on the administrative
record (Docket Entry No. 14), to which defendant has responded
(Docket Entry No. 20).  Plaintiff has further filed a reply brief
in support of his position (Docket Entry No. 21).  Upon
consideration of these papers and the transcript of the
administrative record, and for the reasons given below, the
undersigned recommends that plaintiff's motion be GRANTED, and
that the decision of the Commissioner be REVERSED and the cause
REMANDED for an immediate award of benefits.

1

## I.  INTRODUCTION

Plaintiff filed her DIB and SSI applications on September 18, 2002, alleging disability commencing April 1, 2002 (Tr. 61-63, 608-09).  These applications were denied initially and upon reconsideration (Tr. 45-52, 612-19).  Plaintiff thereafter requested and received a *de novo* hearing before an Administrative Law Judge ("ALJ").  The case was heard on September 10, 2004, with plaintiff and an impartial vocational expert testifying (Tr. 628-55).  Plaintiff was represented by counsel at the hearing.

On February 11, 2005, the ALJ issued a written decision finding plaintiff "not disabled" under the Act.  The ALJ made the following enumerated findings:

1.  The claimant met the insured status requirements of the Act as of the alleged disability onset date, April 1, 2002.

2.  The record indicates the claimant has not engaged in substantial gainful activity since the alleged disability onset date, April 1, 2002.

3.  The claimant has a combination of impairments considered "severe," which includes schizophrenia and psychotic disorder, not otherwise specified.

4.  This combination of impairments does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the residual functional capacity to perform any work activity, which accommodates moderate

2

limitations in the ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with the proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and respond appropriately to changes in the work setting.

7.    The claimant can perform her past relevant work as a cashier and as a data entry clerk.

8.    The claimant has been "not disabled," as defined in the Act, since April 1, 2002.

(Tr. 24-25)

On September 17, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 6-8), thereby rendering that decision the final decision of the Commissioner.   This civil action was thereafter timely filed, and the Court has jurisdiction.   42 U.S.C. § 405(g).   If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive.   Id.

3

1. <u>Plaintiff's Age, Education, and Work Experience</u>. Ms. Baugh was 33 years of age on the date of the ALJ's decision. (Tr. 19). She attended through the ninth grade of school and then obtained a G.E.D. Ms. Baugh has past work experience as a cashier, data entry clerk, and customer service representative (Tr. 24).

2. <u>Relevant Medical Facts</u>. According to progress notes from the Mental Health Cooperative dated April 3, 2000, Ms. Baugh was suicidal with some psychosis.[2] (Tr. 327). She was very guarded and suspicious and believed others could read her mind. Dr. Fakhruddin admitted Ms. Baugh to Tennessee Christian Medical Center with a diagnosis of paranoid schizophrenia.[3] (Tr. 136-140). Ms. Baugh was having some suicidal thoughts and was hearing messages from God. She was delusional, having confused thoughts, and felt that somebody was going to hurt her. She was diagnosed with schizophrenia, paranoid, with depression, and was

---

[1]This recitation of the evidence is taken from plaintiff's brief (Docket Entry No. 15 at 2-9). Defendant did not endeavor to summarize the facts, and does not contest plaintiff's summary.

[2]Psychosis is a mental disorder in which there was severe loss of contact with reality, evidenced by delusions, hallucinations, disorganized speech patterns, and bizarre or catatonic behaviors. F.A. Davis, <u>Taber's Cyclopedic Medical Dictionary</u>, 1712 (19th ed. 2001).

[3]Paranoid schizophrenia is characterized by delusions of persecution, grandiosity, jealousy, or hallucinations with persecutory or grandiose content. <u>Taber's</u> at 1850.

4

assigned a Global Assessment of Functioning ("GAF") of 30.[4]

On February 25, 2002, Ms. Baugh was evaluated through the Mental Health Cooperative Program of Assertive Community Treatment ("PACT") plan. (Tr. 250, 256). She was scheduled to meet with a PACT doctor on a monthly or as-needed basis for psychiatric evaluation, symptoms management, and medication management. PACT team members would meet with her two times a week. Ms. Baugh was diagnosed with depressive disorder and psychotic disorder and was assigned a GAF of 46.[5] Id.

Several months later, on July 24, 2002, Ms. Baugh presented to the Mental Health Cooperative for a crisis intake. (Tr. 325-326). Ms. Baugh was found by the police "running around, screaming and hollering, acting very bizarre and paranoid" in Centennial Park. Id. Ms. Baugh had a tearful affect and her mood was depressed, anxious, and irritable. She was unclean, had a disheveled appearance, and her insight and judgment were poor. She believed people were trying to harm her. Ms. Baugh appeared psychotic and might be an immediate danger due

---

[4]The Global Assessment of Functioning Scale ("GAF") ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for self). Diagnostic and Statistical Manual of Mental Disorders–Fourth Edition ("DSM-IV") 32 (4th ed. 1994). A GAF score between 21 to 30 is defined as having behavior that "is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment" or an "inability to function in almost all areas." DSM-IV at 32.

[5]A score between 41 and 50 is defined as manifesting "serious symptoms" (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 32.

5

to her inability to care adequately for her own physical needs. Ms. Baugh was hospitalized and several doctors signed court papers for involuntary commitment during her hospital stay. (Tr. 157-164). Mental status examination revealed her hair was disheveled and she was groggy, falling asleep, and uncooperative. Her affect was flat and her speech was rambling. Her cognition, insight, and judgment were poor. On August 28, 2002, after one month, Ms. Baugh was discharged with a diagnosis of depressive disorder with a GAF of 55.[6] After discharge, Ms. Baugh was visited at her home throughout the following month by Mental Health Cooperative staff for case management of schizophrenia. (Tr. 319-324, 583-587).

PACT team members went to Ms. Baugh's home on September 4, 2002, and transported Ms. Baugh to her appointment with Dr. Corbin. (Tr. 319-321). Ms. Baugh stated she missed the hospital structure, described paranoia, and had suspiciousness about an evil presence and her neighbors. (Tr. 244-248). She was anxious and guarded. Dr. Corbin diagnosed her with a psychotic disorder and paranoia. Ms. Baugh also had impaired concentration and was distractible.

Throughout September 2002, Dr. Corbin and his staff examined and treated Ms. Baugh for psychotic disorder both at her

_____

[6]A score between 51 to 60 is defined as manifesting "moderate symptoms" (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). DSM-IV at 32.

6

residence and on-site. (Tr. 299-314). She was assisted in obtaining food stamps. (Tr. 308). On September 12, 2002, Dr. Corbin observed that Ms. Baugh had delusions of thought broadcasting.[7] She isolated herself to avoid others and had rapid thoughts. Examination showed Ms. Baugh to be anxious and guarded. She was diagnosed with psychosis. She was driven by PACT staff to and from her appointments, the grocery store, the SSI office, and was assisted with financial considerations. (Tr. 302, 307, 309, 313-314).

Over the following months, Ms. Baugh was visited on a regular basis at her home by team members from PACT (September 20, 2002, September 23, 2002, September 25, 2002, September 27, 2002, September 30, 2002, October 2, 2002). (Tr. 295-305). On October 3, 2002, Dr. Corbin and the PACT staff examined and treated Ms. Baugh. Examination revealed she was tearful, expressed psychotic symptoms with thought broadcasting, felt isolated, depressed, bored, and anxious. On examination she was noted to demonstrate psychosis. (Tr. 296). In October 2002, Ms. Baugh was visited at her home repeatedly by PACT team members (October 4, 2002, October 9, 2002, October 14, 2002, October 17, 2002, October 23, 2002, October 24, 2002). (Tr. 237-291). PACT team members assisted her in making goals to complete one

---

[7]"Thought broadcasting" refers to the feeling that one's thoughts are being broadcast to the environment. Dorland's Illustrated Medical Dictionary 1705 (28th ed. 1994).

7

activity a day instead of staying in bed all day and in accomplishing her daily needs, such as shopping, etc.  Id.

On October 23 and 24, 2002, Dr. Corbin completed a PACT comprehensive assessment.  (Tr. 237-239).  Dr. Corbin explained that Ms. Baugh's reason for admission to PACT was her poor daily living skills, her failure to perform daily living tasks, and her difficulty engaging in traditional services.  Ms. Baugh previously had been admitted to Parthenon in January 2000 for suicidal ideation and depressed mood and was again admitted in April 2000, with a diagnosis of schizophrenia.  Ms. Baugh was admitted a third time in July 2002.  Dr. Corbin diagnosed Ms. Baugh with psychotic disorder, rule out schizophrenia, cocaine abuse in remission, and problems with finances.  She was assigned a GAF of 41-50.

Over the following two months, Ms. Baugh was visited on multiple occasions at her home by PACT team members and was treated by Dr. Corbin.  (Tr. 235-362).  She was assisted with food certificates and provided her medications.  On November 14, 2002, Ms. Baugh told Dr. Corbin that she was uncomfortable around others and endorsed thought broadcasting.  (Tr. 370).  She believed others knew her "ugly" thoughts and were purposely disturbing her at her home by making noise outside her window. She was diagnosed with psychotic disorder, stable.  Throughout this time period, Ms. Baugh was worried and anxious, despite PACT

8

efforts to reassure her and accommodate her needs. Ms. Baugh had horrible thoughts about other people. (Tr. 355).

Ms. Baugh continued receiving PACT home visits to monitor her condition and was treated by PACT staff throughout the following months. (Tr. 330-340). On January 7, 2003, Ms. Baugh described having evil thoughts. (Tr. 337). On January 10, 2003, Ms. Baugh again reported evil thoughts. On January 28, 2003, Dr. Corbin examined Ms. Baugh for psychotic disorder. (Tr. 330-331). Examination revealed she still had minimal paranoid thoughts. On February 26, 2003, Dr. Corbin reexamined Ms. Baugh. Dr. Corbin explained that Ms. Baugh's delusions were a usual form of thought broadcasting and fears of being around others. Dr. Corbin diagnosed Ms. Baugh with psychotic disorder, depressive disorder, and posttraumatic stress disorder. (Tr. 395-396). Ms. Baugh was still being assisted by PACT team members in transportation and shopping. (Tr. 378).

From May through June 2003, Dr. Corbin and PACT members provided frequent home visits and assistance to Ms. Baugh for psychotic disorder and schizophrenia. (Tr. 407-449). Ms. Baugh still believed that strangers knew what she was thinking. (Tr. 419). On May 22, 2003, Ms. Baugh attended group therapy and admitted that she was now beginning to recognize that she had delusions. (Tr. 407). Through October 2003, Dr. Corbin and the PACT staff provided home visits, examinations, and assistance

9

with activities of daily living. (Tr. 460-512). On July 18,
2003, Dr. Kondapavulura diagnosed her with schizophrenia,
psychotic disorder, and post traumatic stress disorder. (Tr.
478). On August 21, 2003, a PACT team member reported that Ms.
Baugh had not attended group therapy due to not wanting to get in
the transport van since she believed that the other passengers
could read her mind. (Tr. 464). On September 11, 2003, Ms.
Baugh was currently without psychosis. (Tr. 460). She continued
to be treated during home visits and office visits between
October 2003 and January 2004. (Tr. 510-542). On October 9,
2003, Dr. Lynch examined Ms. Baugh who noted improvement with her
racing thoughts but reported Ms. Baugh had an altercation with
her sister. (Tr. 510). Examination revealed mildly pressured
speech and linear thoughts. She was diagnosed with
schizophrenia, paranoid type, psychotic disorder, and post-
traumatic stress disorder.

On December 1, 2003, PACT nurse practitioner Hollis
("Nurse Hollis") examined Ms. Baugh. (Tr. 493). Ms. Baugh was
keeping her daughter more and was not sleeping well due to her
grandmother's illness. She was diagnosed with paranoid
schizophrenia and psychotic disorder and she was given an
injection of Haldol. (Tr. 493). Ms. Baugh was having problems
getting along with her mother and sister in December 2003. Ms.
Baugh had poor insight in dealing with her problems. (Tr. 492).

10

On January 15, 2004, Ms. Baugh was given an injection of Haldol and reported feeling tired from staying at the hospital with her grandmother. (Tr. 544). On January 21, 2004, Nurse Hollis examined Ms. Baugh for sleep problems and difficulty with memory. Her worsening insomnia was probably related to stress. She was diagnosed with paranoid schizophrenia and psychotic disorder. (Tr. 543).

From February through May 2004, Ms. Baugh continued to be treated for paranoid schizophrenia and psychotic disorder. (Tr. 514-595). During this time, Ms. Baugh reported ongoing sleep problems and was noted to be sleeping in the daytime when visited for home visits. (Tr. 527-537). On April 19, 2004, Ms. Baugh told Nurse Hollis that she was trying to find employment and was doing day labor. (Tr. 518).

Ms. Baugh had an interview with Sprint in April 2004, and reported to PACT team members that she planned to work full time and get off of disability. The PACT team member advised Ms. Baugh regarding the additional stressors that could be associated with work. (Tr. 514). On May 5, 2004, Dr. Lynch completed a mental health form for the First Circuit Court of Davidson County, Tennessee, requesting that Ms. Baugh's mandatory outpatient treatment should be renewed. Without continuing mandatory treatment, Ms. Baugh would likely decompensate and require hospitalization. (Tr. 595).

11

On May 17, 2004, Ms. Baugh reported concerns with her daughter living with her because she was not ready to be a full time mother. (Tr. 578). On June 4, 2004, Nurse Hollis examined Ms. Baugh who stated she was enjoying her work at Sprint and that her job was stressful but she was handling it well. (Tr. 572). However, in less than two weeks, on June 15, 2004, Ms. Baugh told the PACT team member that she had quit her job at Sprint because it was too difficult for her. She found temporary work with the Sheraton and hoped it would become permanent. (Tr. 566).

By August 9, 2004, Ms. Baugh's psychotic symptoms returned in full force. (Tr. 553). Ms. Baugh had a depressed mood with congruent affect. She was sleeping two to three hours intermittently and her sleep issues had increased since starting work a month ago. She believed others could read her thoughts. She was having thought broadcasting at work and had an increase in her paranoia, insomnia, and her appetite. She was also feeling depressed. Nurse Hollis provided educational material that stated that with an increase in stress often came an increase in psychiatric symptoms. She was started on Risperdal for her psychosis. (Tr. 553).

One week later, on August 16, 2004, Ms. Baugh again reported quitting her job due to too much stress. (Tr. 553). Her daughter had moved back with her father for the school year. (Tr. 551). On September 9, 2004, Nurse Hollis completed a

12

medical form, also signed by Dr. Lynch, regarding Ms. Baugh's mental condition wherein it was indicated that Ms. Baugh was seriously limited or completely precluded from performing a significant number of mental work-related activities. (Tr. 24, 605-607).

       **3. Summary of Relevant Testimony.** During the hearing, Ms. Baugh testified to her frequent and short-lived job attempts. She was unable to work because she is "constantly thinking that people are trying to do things to [her]" and because people know what she is thinking and are out to get her. (Tr. 637). She tried to go back to work at Sprint and just could not handle it. (Tr. 638). Ms. Baugh described her depression and her eating disorder that causes her to binge. (Tr. 640). Referring to "people" that she could "hear," Ms. Baugh explained:

> They make noises. They turn my lights on and off.
> I've had somebody even throw something at me once.
> People, they bother me. I feel like people, I feel
> like – this may sound crazy, but I feel like I have
> been tampered with. I feel like somebody has implanted
> something in my mind, in my brain. I feel like there's
> been an implant implanted. And I think that the only
> way that somebody could have gotten to me is while I am
> sleeping and I just feel like people, they do things to
> me.

(Tr. 641). Ms. Baugh goes to Nurse Hollis for treatment at the PACT Mental Health Cooperative. (Tr. 643). She had to be placed on Risperdal because her paranoid symptoms increased when she tried to go back to work at Sprint. (Tr. 644). Ms. Baugh explained that no medications will help her because she insisted

13

that what she is describing is really occurring.  (Tr. 645).

### III.  CONCLUSIONS OF LAW

#### A.  Standard of Review

        This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Sec'y of Health & Human Servs., 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).

        "Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)).  It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Comm'r of Soc. Sec., 105 F.3d 244, 245 (6th Cir. 1996).  Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached.  Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).  However, if the

14

record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Sec'y of Health & Human Servs., 753 F.2d 517, 519 (6th Cir. 1985).

      B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[8] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.

---

    [8]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

Case 3:05-cv-00951   Document 23   Filed 09/11/07   Page 15 of 28 PageID #: 108

(5)  Once the claimant establishes a <u>prima</u> <u>facie</u> case of
     disability, it becomes the Commissioner's burden to
     establish the claimant's ability to work by proving the
     existence of a significant number of jobs in the national
     economy which the claimant could perform, given his or her
     age, experience, education, and residual functional
     capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule.  Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. <u>Id.</u>  In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's <u>prima</u> <u>facie</u> case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony.  <u>See</u> <u>Varley v. Sec'y of Health</u> <u>& Human Servs.</u>, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional

16

and nonexertional, severe and nonsevere.  See 42 U.S.C. §
423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C.  Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred, at step three of
the sequential evaluation process, by making the general finding
that plaintiff's combination of impairments is not severe enough
to meet or medically equal the criteria of any listed impairment,
when the facts of this case clearly implicated Listing 12.03
(Schizophrenic, Paranoid and Other Psychotic Disorders) and
merited a discussion of, and specific findings related to, the
criteria of that Listing.  Plaintiff seeks a judicial award of
benefits based on her satisfaction of Listing 12.03, or,
alternatively, an order of remand requiring the ALJ in the first
instance to evaluate properly the application of that Listing.
Plaintiff further argues that the ALJ erred at subsequent steps
of the process by basing his finding of plaintiff's residual
functional capacity on the 2002 assessment by a nonexamining
state agency consultant, rather than the more recent opinions of
plaintiff's treating sources that took into account her
unsuccessful attempt to return to the workplace in 2004.  As
explained below, the undersigned finds merit in both arguments.

As referenced earlier in this report, a claimant who is
not engaged in substantial gainful activity, and whose severe
impairment(s) meets or medically equals the criteria of a listed

17

impairment, is by law presumed disabled and therefore entitled to benefits.  As noted by defendant, it is plaintiff's burden to show, based on acceptable medical evidence alone, <u>Dorton v. Heckler</u>, 789 F.2d 363, 366 (6th Cir. 1987), that she satisfies <u>all</u> of the criteria of the pertinent Listing.  <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530-31 (1990).

Listing 12.03 provides as follows:

*Schizophrenic, Paranoid and Other Psychotic Disorders:*  Characterized by the onset of psychotic features with deterioration from a previous level of functioning.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.  Medically documented persistence, either continuous or intermittent, of one or more of the following:
1.  Delusions or hallucinations; or
2.  Catatonic or other grossly disorganized behavior; or
3.  Incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with one of the following:
a.  Blunt affect; or
b.  Flat affect; or
c.  Inappropriate affect; or
4.  Emotional withdrawal and/or isolation;

AND

B.  Resulting in at least two of the following:
1.  Marked restriction of activities of daily living; or
2.  Marked difficulties in maintaining social functioning; or
3.  Marked difficulties in maintaining concentration, persistence, or pace; or
4.  Repeated episodes of decompensation, each of extended duration;

18

OR

  C. Medically documented history of a chronic
schizophrenic, paranoid, or other psychotic disorder of
at least 2 years' duration that has caused more than a
minimal limitation of ability to do basic work
activities, with symptoms or signs currently attenuated
by medication or psychosocial support, and one of the
following:
  1. Repeated episodes of decompensation, each of
extended duration; or
  2. A residual disease process that has resulted
in such marginal adjustment that even a minimal
increase in mental demands or change in the environment
would be predicted to cause the individual to
decompensate; or
  3. Current history of 1 or more years' inability
to function outside a highly supportive living
arrangement, with an indication of continued need for
such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.

  Plaintiff argues that her condition satisfies the

criteria of subsection C of this Listing.  There appears to be no

dispute that plaintiff satisfies the introductory diagnostic

description of a disorder "[c]haracterized by the onset of

psychotic features with deterioration from a previous level of

functioning."  Likewise, there appears to be no dispute that

plaintiff satisfies the requirement of a documented medical

history of chronic psychosis enduring for at least two years,

causing more than minimal work-related functional limitations,

with symptoms currently attenuated by both medication and

psychosocial support.  And rightly so, for the record in this

case reveals a medical history of over four years marked by

significant exacerbations of plaintiff's paranoid schizophrenia

19

and depression, beginning with plaintiff's brief admission to Parthenon Pavilion in December 1999 for what was regarded as an acute exacerbation of depression (Tr. 146), followed by another voluntary admission to inpatient treatment at the Tennessee Christian Psychiatric Unit in April 2000 under the diagnoses of paranoid schizophrenia and depression (Tr. 136-40), and culminating in plaintiff's month-long involuntary civil commitment to inpatient treatment at the Middle Tennessee Mental Health Institute during July-August 2002 (Tr. 157-210). Since her discharge from inpatient care in August 2002, plaintiff has continuously received involuntary outpatient care pursuant to court order, in accordance with the laws of the state of Tennessee. Tenn. Code Ann. § 33-6-601 <u>et</u> <u>seq.</u> Though the ALJ found that plaintiff had worked at a child care center at some indeterminate point after the alleged onset of disability on April 1, 2002 (Tr. 19-20), it is far from certain that plaintiff in fact performed this work after the alleged onset date, given her confused testimony (Tr. 633-34) and her relatively low 2002 earnings from that job (Tr. 75). In any event, it is clear that plaintiff's significant, work-related psychological limitations have been on display since at least July 24, 2002, with the attenuation of such limiting symptoms by antipsychotic

medications and other therapies since that time.[9]

It is the remaining severity criteria of Listing 12.03(C) that are the subject of dispute here. Plaintiff argues that she meets both 12.03(C)(2) and (C)(3), either one of which would suffice to render her presumptively disabled. While the medical record does not overwhelmingly support plaintiff's predicted decompensation with even a minimal increase in mental demands or environmental change, the undersigned does find in the record such overwhelming support for 12.03(C)(3)'s requirement of a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.[10]

Defendant in its papers characterizes "the services provided through PACT [as] little more than checking in with the plaintiff a few times a week and delivering medication and

---

[9]In what plaintiff decries as "selective cherry-picking from the record," the ALJ's summary of the PACT records (Tr. 20-21) is devoted to the highlights of plaintiff's reports to her case managers, including notations of "mild" or "slight" symptoms, "no overt psychosis," and plaintiff's ability to function relatively well on Haldol and her other prescribed medications. However, as contemplated by the Listing, the attenuated symptoms which the ALJ seized upon are properly recognized as the product of plaintiff's supportive environment, in the undersigned's view.

[10]It is noted here that there is some force to the argument that a specific determination of Listing applicability should be made in the first instance by the agency below, upon the instructions of this Court in its order of remand. See, e.g., Miller v. Comm'r of Soc. Sec., 181 F.Supp.2d 816, 820 (S.D. Ohio 2001). However, as further discussed below, the medical record of plaintiff's inability to function outside her highly supportive living arrangement is so one-sided as not to admit of any contrary interpretation, in the undersigned's view. In such circumstances, and in the absence of unresolved factual issues, a judicial award of benefits is appropriate. Faucher v. Sec'y of Health & Human Servs., 17 F.3d 171, 175-76 (6th Cir. 1994).

21

providing transportation." (Docket Entry No. 20 at 5) Defendant
further states that plaintiff "lived by herself and cared for
herself," "was far from housebound and . . . was clearly able to
function outside her home." (Id.) However, defendant
significantly understates the network of services provided
through PACT and the Mental Health Cooperative, and fails to
appreciate the distinction between plaintiff's ability -- with
treatment -- to function outside the walls of her home, and her
inability to function outside of her "living arrangement."

Pursuant to state law, plaintiff's "living arrangement"
is essentially a term of supervised release from her involuntary
commitment as a hospital inpatient,[11] and it is highly supportive

---

[11]Under the Tennessee statutory scheme, involuntarily committed mental
health patients may be released from hospitalization subject to mandatory
outpatient treatment if the hospital staff concludes from a longitudinal
review of the patient's history that:

(A) the person has a mental illness or serious emotional disturbance or
has a mental illness or serious emotional disturbance in remission; and
(B) the person's condition resulting from mental illness or serious
emotional disturbance is likely to deteriorate rapidly to the point that the
person will pose a likelihood of serious harm under § 33-6-501 unless
treatment is continued; and
(C) the person is not likely to participate in outpatient treatment
unless legally obligated to do so; and
(D) mandatory outpatient treatment is a suitable less drastic
alternative to commitment.

Tenn. Code Ann. § 33-6-602. Such outpatient treatment must be provided
according to a plan approved by the releasing hospital, and must be outlined
in a clear written statement to the patient. Tenn. Code Ann. § 33-6-603. If
the patient refuses to comply with the treatment plan without good cause, the
court that committed the patient may institute enforcement proceedings and may
ultimately recommit the patient to hospitalization if compliance with the
treatment plan cannot be secured. Tenn. Code Ann. §§ 33-6-609, 33-6-610.
Unless extended or earlier terminated, the duration of mandatory outpatient
care is limited to six months. Tenn. Code Ann. § 33-6-623. However, as in
plaintiff's case, the term of mandatory outpatient care may be renewed at the
end of every six month period for an additional six months, upon notice by the
patient's qualified mental health professional to the patient, the patient's

with respect to both the medical management of her symptoms and psychosocial factors. As a condition of that release from commitment, plaintiff was bound to submit to injections of Haldol decanoate administered by PACT case managers every few weeks until August 9, 2004, when Haldol was discontinued in favor of Risperdal (Tr. 553). She was further bound to take other prescribed psychotropic medications and to attend monthly psychiatric examinations at the Mental Health Cooperative, to which she was transported by a PACT team member. On at least one occasion, plaintiff neglected to take her oral medications, at which point she was reminded that she was required to take all medications that are prescribed, failing which "PACT would go to daily med drop." (Tr. 457).[12] In addition to enforcing prescribed medical management efforts, PACT facilitated plaintiff's participation in group therapy at the Mental Health Cooperative, her attendance several times a week at other therapeutic sessions at the Park Center Housing Support Center (Tr. 431), and whatever activities of daily living she required assistance with. While such an arrangement is perhaps not highly

---

attorney, the hospital, and the committing court that the patient continues to meet the profile described in the previously referenced § 33-6-602(A)-(D). Tenn. Code Ann. § 33-6-621.

[12]Despite medical evidence of the fact that plaintiff's "illness limits her insight into the need for treatment" (Tr. 232), the ALJ held plaintiff's somewhat lackluster compliance with prescribed medical treatment against her in analyzing her credibility (Tr. 22), when in fact such evidence appears to underscore plaintiff's inability to function independently of her court-ordered supervision.

structured on an everyday basis as in the inpatient setting, it
does not appear that the Listing demands such a degree of
psychosocial support, nor is it reasonably contested that
plaintiff's living arrangement is designed to provide structure
and availability of care similar to inpatient living, only "less
drastic." Tenn. Code Ann. § 33-6-602(D). <u>Cf.</u> 20 C.F.R. Pt. 404,
Subpt. P, App. 1, § 12.00(F).[13] Suffice it to say that
plaintiff's functional abilities touted in the government's brief
are in part the product of the structure provided by the
psychosocial aspects of PACT intervention two to three times per
week, and in larger part the product of PACT intervention to
ensure medication compliance. Thus, it is clear to the
undersigned that plaintiff's living arrangement is a "highly
supportive" one.

Perhaps most importantly, the satisfaction of Listing
criteria must be shown by medical evidence, and plaintiff's
inability to function outside of her highly supportive living
arrangement is established by the unrebutted opinions of two

---

[13]Section 12.00(F) provides as follows:
*Effects of structured settings*. Particularly in cases involving chronic
mental disorders, overt symptomatology may be controlled or attenuated by
psychosocial factors such as placement in a hospital, halfway house, board and
care facility, or other environment that provides similar structure. Highly
structured and supportive settings may also be found in your home. Such
settings may greatly reduce the mental demands placed on you. With lowered
mental demands, overt symptoms and signs of the underlying mental disorder may
be minimized. At the same time, however, your ability to function outside of
such a structured or supportive setting may not have changed. If your
symptomatology is controlled or attenuated by psychosocial factors, we must
consider your ability to function outside of such highly structured settings.
...

treating psychiatrists. On a form which, notably, was not completed for the purpose of securing disability benefits for plaintiff, Dr. Corbin opined in January 2003 that plaintiff's "illness limits her insight into the need for treatment and she would likely decompensate without the obligation." (Tr. 232) On the same form, Dr. Lynch opined in May 2004 "that without continuing mandatory treatment, [plaintiff] will likely decompensate and require hospitalization." (Tr. 595) This opinion by Dr. Lynch clearly satisfied the requirement of "an indication of continued need for such an arrangement." While the undersigned does not construe the Listing language as requiring the "inability to function" to prevent plaintiff from attending to her basic human needs, it is evident that the termination of her current arrangement, along with her documented inability to maintain her treatment regimen independently, might well produce that very result.

Finally, as argued by plaintiff and noted by at least one commentator,[14] it is perhaps most telling of a person's inability to function outside of their highly supportive living arrangement when that person tries and fails to reenter the work

_____

[14]"Testimony from the claimant about his or her failed efforts to work may be strong evidence of disability. A history of many jobs for short periods of time ending with the claimant getting fired or quitting impulsively can be extremely effective in proving disability. The point of the hearing is to determine the claimant's ability or inability to work. The actual result when the claimant did try to work with the impairment has to be about the most important evidence one can present." Charles T. Hall, Social Security Disability Practice § 7:36 (2007).

25

force. Even at a time when plaintiff's psychotic symptoms were significantly ameliorated by her treatment regime, the warnings of her caregivers (not to mention the assessment by her treating nurse practitioner and psychiatrist, Tr. 602-07) proved sage when her attempt to return to full-time work in 2004 was aborted after an increase in psychotic and other psychiatric symptoms (Tr. 553, 566).[15] Though it is recommended that this case be decided at step three under Listing 12.03(C)(3), it is likewise clear to the undersigned that if the case should proceed in the sequential evaluation process to a determination of plaintiff's residual functional capacity, her treating sources' prediction of decompensation in the workplace should be given controlling weight over the 2002 assessment of the nonexamining state agency psychologist.

     In sum, the undersigned finds that the medical record overwhelmingly establishes plaintiff's satisfaction of the criteria of Listing 12.03(C)(3), and that a remand is in order for the purpose of awarding all benefits owing since July 24, 2002, the date on which plaintiff's involuntary commitment to mental health care began. In the alternative, the undersigned

---

[15]The regulations recognize that even when prescribed treatment not only ameliorates an individual's chronic mental symptoms and signs, but returns that individual to a level of functioning close to the level she enjoyed before the symptoms and signs of mental illness appeared, such "[t]reatment may or may not assist in the achievement of a level of adaptation adequate to perform [substantial gainful activity]." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(H).

26

would recommend that the case be remanded for further proceedings so that the ALJ may give due consideration to the applicability of Listing 12.03 and, if necessary, revisit the issue of plaintiff's residual functional capacity.

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the Commissioner be REVERSED and the cause REMANDED for an immediate award of benefits.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 11th day of September, 2007.


　s/ John S. Bryant　　　　　　　
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

Case 3:05-cv-00951   Document 23   Filed 09/11/07   Page 28 of 28 PageID #: 121